and I represent Petitioner. Before you today, the one initial issue which must be determined is whether the IJ immigration judge finding that Mr. Tabet's testimony lacks credibility is supported by substantial evidence. The other issues will necessarily follow, such as did Mr. Tabet met his burden of showing past persecution? Did he establish a well-founded field of future persecution? And the fourth issue is addressed in my leave to file supplemental briefing, namely, when does the voluntary departure period begins? And lastly, whether the BIA committed a reversible error in failing to admit into evidence two documents? I begin my discussion with the adverse credibility determination which this Court reviews under the substantial evidence rule. In her decision, the immigration judge did not point to non-verbal communication. That is, she did not address, she did not base her decision of finding of adverse credibility based on his demeanor. And therefore, her decision is not entitled to a special deference as referred to in the Arul Lam Palam v. Ashcroft. Rather, the credibility determination rested on his testimony, all of which is before you and, if I may add, unsupported by the evidence. The inconsistencies mentioned by the IJs were three. The first are the dates of the attempts to kill Mr. Tabat. The second is some omissions from his asylum application. And the third is the unsupported and erroneous determination that Mr. Tabat did not mention one of the attempts on his life in his direct examination which took place some 18 months earlier. As to the dates, the record is clear. Mr. Tabat did not mention one of the attempts on his life. Mr. Tabat was confused, but he never wavered as to the circumstances of the attempt on his life, to the companions that were with him, that one of them was killed and the other was injured, and to any, and to the location. This circuit held in Veloria v. Lopez, Veloria Lopez v. INS, the discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not adequate basis for an adverse credibility finding. In Damaz Job v. INS, the circuit reversed the BIA on adverse credibility finding because the court could not fathom any possible reason Damaz would intentionally have provided incorrect date of birth of his children. Counsel, don't you think it's significant that only one out of the three attempts on his life were mentioned in the application itself and that two of the attempts at his home and where Mr. Hossein was killed were not mentioned until cross-examination at the hearing sometime later? Judge Layton, the asylum application was filed by a non-attorney. He said he could not provide the information. He wrote all the information to this non-Arabic speaking non-attorney and he went to the interview without legal representation. He had an interpreter with him. Keep in mind that background. As to the direct examination, the judge committed a clear error. They were mentioning, he mentioned specifically Mr. Hossein's death and the shooting by, of, against him in the presence of Mr. Ali. Those, he may not have mentioned exactly the dates of those, he may have confused the dates, but in direct examination he mentioned both of those situations. So the judge is, you know, reasonably so. Eighteen months before she heard the direct examination. Eighteen months later she hears the cross-examination and redirect and just didn't keep good notes. That's because the records is clear on that. He referred to those. Is the record reasonably clear that the, what I refer to as the Land Rover incident, that the testimony was consistent and corroborated? Yes, Your Honor. Judge Layton, in my brief, we cite exactly the pages and the, and what was said in his cross and redirect. And the incidents I'm referring to are set forth, let's see here. On page 16 we refer to the second shooting. He refers to it in the asylum application, in his direct examination in June 99 and in February 6, 2001. As to the third shooting, nor mention the asylum application, but reference in the first direct and on the redirect. That's page 17 for the third shooting. The second issue before us is whether the omission from the asylum application is a ground for an adverse credibility determination. This circuit has found that omission from an asylum application are often not sufficient basis for discrediting later testimony. I cited in my brief the cases for omission of what? Omission, omission of obviously any information. And this, and the reason why the omission I'm saying is general omission is because those asylum seekers are typically poor, uneducated, illiterate, and the court gives them some leeway, if I may add, at that early stage. And that's what I'm referring to. I'm not referring to omission in his direct or cross-examination. I'm only referring to omissions at the early stage when an asylum seeker comes in and files his or her application. So because of that, poor, illiterate, and typical asylum seeker, frankly, Mr. Tabat fits that criteria. No English skills, at the time poor, and trusting, he went to see an attorney in Los Angeles, turned out to be non-lawyer. There's no reference whatsoever in any of the initial filing that he was represented by an attorney, although he believed that he was seeing an attorney. What explanation do you have regarding the apparent discrepancy on the dates on the application? There was one section signed in 94 and one bore a signature date of January 15, 98. What significance, if any, do you attach to that, and why did that happen? Was that in reference to the first shooting? No, no, no. This is just the application itself, the signature by your client. Oh, the signature. One purported to be in 1994, one signature, and one purported to be in 1998, if I understand the record correctly. Oh, the 1998 is when the proceeding may have begun against him, and he filed the asylum application in 1994. Anything, what happened in January 1998? January 1998, maybe this is, and I'm going by memory here, maybe this is when the notice to appear was in 1999, first individual hearing was in 1999. As to the, lastly on this point, discrepancies that cannot be viewed as an attempt to enhance his claim of persecution has no bearing on credibility. Now, look at this case. What benefit would he have if he says I was shot at in 1991 versus 1992? No, no, nothing whatsoever, yet the judge makes a big deal about this. But if you were shot at three times, and in one incident a companion was wounded and in another incident a companion was killed, don't you think that it's reasonable to expect that one seeking asylum for fear of, out of a fear of persecution would mention those incidents in addition to the, what I refer to as the Land Rover incident? I'm not concerned about the concept of time, but if I'm applying for asylum, the first words out of my mouth are going to mention all three of those incidents, I think. Well, if we look at what else did Mr. Tabbit do? He said in his direct testimony in Pravi Cross that he filed, he submitted his asylum application in 1985, yet he came to this application that he really was completely nervous and not in touch with time. And this is a great example. In 1985 he wasn't even here. I wonder if, I don't know how much, well, I don't have much time to reserve. The voluntary departure issue I discussed, and I hope you look into that. Thank you so much. Thank you. We'll give you a minute for rebuttal, all right? Thank you. If it pleases the Court, my name is Don G. Scroggin, and I represent the United States Attorney General, the respondent in this matter. Your Honors, in this case, the immigration judge reasonably concluded, based on substantial evidence in the record, that Mr. Tabbit was not a credible witness, and the evidence does not compel a contrary finding. The immigration judge offered specific, cogent reasons for finding Mr. Tabbit not credible. Those reasons go to the very heart of Mr. Tabbit's asylum claim. There are no translation problems relating to the inconsistencies. And Mr. Tabbit offered no reasonable explanation for the inconsistencies when offered an opportunity to do so. Well, you know, he did offer these two letters to corroborate his story, which the immigration judge refused to admit. Now, you addressed in your brief the, you know, also he refused a continuance. You addressed the denial of the continuance. But you really don't address why it was proper not to admit those letters right on the spot. And that's part of the argument he makes. It was error, abuse of discretion not to admit those letters when they were offered. And certainly the one from the Ministry of Justice corroborates the story, right? In other words, maybe it wouldn't compel a finding to the contrary, but it would certainly make it easier to make one. It would make his story much more believable. And, you know, it gives it credence. It's corroborated. Now, how can you justify, it seems picayune to me, the reasons given by the I.J. for not admitting that letter from the Ministry of Justice or the Supreme Court, I guess it was. Your Honor, with respect to those documents, Mr. Tabbit's counsel informed the immigration judge that he was fully aware of the rules requiring proper authentication. Well, they were authenticated. You know, I think his reasons given were pretty, I mean, picayune. I mean, he said, well, he didn't translate the signature. How did he translate the signature? Your Honor, the immigration judge found that there had been, that they were not authenticated and that they had not been properly submitted. Oh, he said certain parts were not authenticated. That's right. Like the letterhead, for instance. Certain parts were not translated. The letterhead and the signature. I don't know. How do you tell me, how do you authenticate a signature? Your Honor, certain other parts of the documents the immigration found were not translated. Moreover, he gave counsel for Mr. Tabbit an opportunity to explain why they had not been authenticated or translated, and no explanation was offered. No explanation was offered in the brief, and no explanation has been offered this morning. Counsel, would you agree that the accounts given by Mr. Tabbit regarding the Land Rover incident were consistent and corroborated by the documents that Mr. Tabbit sought to present to the IJ? No, Your Honor, I would not. And I would like to turn again, if I might, Your Honor, to your question about Mr. Tabbit's explanation. I would direct the Court's attention to ten pages in this record. If you read nothing else but these ten pages, they do speak with memorable clarity to the single issue that is before the Court. Those ten pages in the record are 201 to 211. This is the beginning of the cross-examination of Mr. Tabbit. The issue has been raised this morning of whether Mr. Tabbit had assistance of counsel with respect to preparation of his asylum application. It is relevant that at the beginning of the hearing, the asylum judge had Mr. Tabbit read and review, with assistance of counsel, his asylum application. And the question about the signature is the immigration judge had him sign it again at the beginning of the hearing, after having read it and after swearing everything was true. These ten pages deal with the beginning of the cross-examination. Mr. Tabbit has, at this point, had seven years to get his story straight, with assistance of counsel. So far, up to this point, where the cross-examination begins, there has been one shooting described, one shooting in the asylum application, one shooting, a drive-by shooting by unknown persons in which Mr. Tabbit was not injured, but his passenger was, in the direct examination. Then comes the revelation in these ten pages. After the lengthy direct examination by his own counsel, the INS counsel asked Mr. Tabbit details about this single shooting. Suddenly, and for the very first time, Mr. Tabbit adds to the basis of his asylum claim a virtual cornucopia of violence and shootings. He adds two more shootings and a killing that have never before been referred to. The testimony sends both the immigration judge and the INS counsel back to their notes of the previous hearing. They do then confirm on the record that this is the very first mention of the two new shootings. And during this consultation, Mr. Tabbit remains silent. Mr. Tabbit's counsel remains silent. When Mr. Tabbit is then offered an opportunity, Your Honor, you had asked the question about his being offered an opportunity to explain. He's offered an opportunity to explain the significant discrepancy in these ten pages. Between the testimony he has just given and his prior testimony in his asylum application and in his direct testimony, Mr. Tabbit's answer regarding why he has not previously mentioned the other two shootings and the killing is, and I quote, it's possible I forgot. This explanation the United States represents is inadequate. His enhancement of his asylum claim or his changing the inconsistencies in his testimony are designed to enhance his asylum claim. We're told today that, in fact, he did mention one of them. And I don't know that it's unfair that he, when asked why didn't you mention them, offers up maybe I forgot. I mean, I don't think he has a real response to the question. But did he, in fact, mention a second episode during his direct experience? Which episode are you referring to, the one in which the person was killed? I have to confess I have now lost track. Your Honor, that's why I'm directing the Court's attention to these ten pages, because they bring into sharp focus what has happened and the sequence before. There's been no mention of shootings other than the single shooting, and it has been consistent up until these ten pages. It is revealing, and I would have to say it is misleading in Petitioner's brief to bring in the killing of Mr. Hosen, because that killing was unrelated. It happened in 1984, seven years earlier, according to Mr. Taft's own testimony. It had absolutely nothing to do with these sequences. He was not there. He heard about that killing. And in these ten pages, all of a sudden, the consistent story of one killing turns into one shooting turns into three shootings and a killing, not as someone whom he heard was killed, but someone who was next to him. These are not minor issues. They are material issues. The explanation, I would suggest, it's possible I forgot, quote, unquote, is inadequate. The immigration judge reasonably found it completely implausible that Mr. Taft would remember only at the end of three hearings two more shootings, one of which was far more horrific than anything previously related. And the immigration judge concluded on substantial evidence that these inconsistencies are material and went to the heart of Mr. Taft's asylum claim. However, if this Court were to find that the evidence is so overwhelming and that no reasonable fact finder could find anything other than that Mr. Taft is credible, then it must remand this case to the Board for consideration on the merits. This case is, before this Court, on a single issue, credibility. There has been no decision on the merits and no decision with respect to discretion of asylum. Well, maybe it is and maybe it isn't. Address this question for me. Apparently, the letter we were talking about earlier was retranslated and then was submitted to the Board. It's a part of the right. There are two translations that are part of the administrative record. Isn't that correct? And one of the deficiencies of the streamlining procedure, you know, is there's no way to tell. In fact, it's deliberately hidden from us as to whether or not the Board considered the retranslated letter. So, you know, maybe it's your only uncredibility and maybe it's not. You know, we don't know, do we? You think they considered the letter? They, meaning the Board? The Board rested upon the integrity. The Board rested upon the integrity. The retranslated letter was before the Board, right? Yes, Your Honor. And they considered it? Your Honor, the decision is that the immigration judge, that they relied upon the immigration judge's decision and any additional evidence they must have deemed to not have been, to create an error in that decision. I don't think I have. You don't know either. That's correct, Your Honor. That's the limitations of the streamlining system. All right. Let me ask you an entirely different question. You know, we received, it was filed two days ago, a motion for leave to file supplemental briefing by the Petitioner. I don't know if you've seen it or not. Yes, Your Honor. I received it last night from my hotel. It's essentially, I think, a request for a non-pro-tunk order granting a stay of voluntary departure. That's the way I read it. What's the government's position on this motion? We oppose the supplemental briefing, Your Honor. What about the substance of the motion? Well, Zazuita Carrillo, the case at issue, the court in that case determined that this court lacks authority in a removal case to reinstate voluntary departure if that voluntary departure grant has expired. While it's true that in the Zazuita case, the court did not apply that holding retroactively, here there's no reason not to follow the law. That case simply summarized the law that had changed in 1996 by an act of Congress. And particularly here, Your Honor, I think it is useful in the timing, that case, Zazuita Carrillo, had been decided almost four months before Petitioner filed its brief, and it had been decided 11 months before we received, all of us, last night, this motion. The United States' position would be that it's untimely and should be denied. So if there's any inclination, and I have no idea what it is because we haven't considered it, but if there's any inclination by the panel to grant the motion, you want an opportunity to file something in writing? I beg your pardon, Your Honor? You want an opportunity to file something in writing? Yes, Your Honor. If the judge wishes, if the court wishes to consider this matter, we would request an opportunity for supplemental briefing. Under the rules, you know, the time, as you know, to file an opposition to motion has not expired. This was only filed on the 9th of this month. So, all right. I think we ought to give you, what, a week from today? Is that enough to file an opposition to the motion? To file an opposition to the motion for supplemental briefing.  Yes, Your Honor. But, you know, I think, and, you know, I'll give you fair notice, you know, the motion itself is, you know, has some argument on the merits. I think you ought to address it, too, as you started to do here. Okay? So we'll give you a week from today to file opposition to this pending motion. All right? Okay. Okay. Thank you. Thank you.  You have a brief opportunity for rebuttal. The evidence is very clear, Your Honor. Mr. Tabet talked about the killing of Mr. Hossain on page 108 of the record. Now, what led to the death of Mr. Hossain? It was a kind of revenge. This is a direct examination on June 1999. Followed up by on page 109 of the record. And who did Mr. Hossain belong to? Which political party? The same I belong to. This is clear evidence that we talked about the killing of Mr. Hossain, which the judge totally forgot. And now we hear that Mr. Tabet never discussed. And this is cited on page 17 of my brief. Thank you. Thank you. All right. Thank you. Then since we have a pending motion we have to address anyway, I think we'll defer submission of this case, as well as the decision on the motion, for one week until the week from today. All right? So both the cases argued today and the pending motion will be submitted for decision one week from today. Thank you, counsel, for your free argument in this case. Very helpful. OK. Next question on the excuse me, next issue. Next question. Next case on the argument calendar is.
judges: Goodwin, Tashima, Clifton